UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KYLIE MURRAY | ) |
| | ) |
| Plaintiff, | ) Civil Action No.: |
| | ) |
| v. | ) **COMPLAINT AND DEMAND** |
| | ) **FOR JURY TRIAL** |
| | ) |
| PRESIDENT AND FELLOWS OF | ) |
| HARVARD COLLEGE | ) |
| d/b/a HARVARD UNIVERSITY | ) |
| | ) |
| Defendant . | ) |
| | ) |

## PARTIES

1. The Plaintiff, Kylie Murray (hereinafter "Murray"), is an adult individual residing in the town of Bristol, United Kingdom.

2. The Defendant, President and Fellows of Harvard College d/b/a Harvard University (hereinafter "Harvard"), is a private university and graduate school located in Cambridge, MA.

## JURISDICTION

3. There is diversity of citizenship between the Plaintiff and the Defendant in this matter. The amount in dispute in this action, exclusive of interest and costs, exceeds the sum of $75,000.00. Therefore, this court has jurisdiction over this dispute by virtue of 28 U.S.C. § 1332 (2007).

## VENUE

4. Venue is proper in this court pursuant to 28 U.S.C. § 1391(a) and (b).

## FACTUAL BACKGROUND

5. Plaintiff, Murray, was a PhD student at the University of Oxford, in Oxford, United Kingdom. Murray was accepted into a prestigious graduate fellowship program (Knox Fellowship) at Harvard for the 2010-2011 academic year. The Fellowship provides funding for students from Australia, Canada, New Zealand and the United Kingdom to conduct graduate studies at Harvard. Recipients are selected on the basis

of outstanding academic performance, strength of character, and potential for leadership in their field. At all relevant times Harvard was a recipient of Federal financial assistance sufficient to comply with the requirements of Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act, Title III (ADA 1990).

6. At all relevant times, Murray was a disabled person who suffered from a series of medical conditions that required medical treatment and reasonable accommodations. These medical conditions included Postural Orthostatic Tachycardia Syndrome (POTS), a malfunction of the autonomic nervous system which causes rapid heart weakness, fatigue and a severe drop in blood pressure, Vasovagal Syncope, a condition which causes a sharp drop in blood pressure, which can result in loss of consciousness, Ehlers Danlos Syndrome, Type III, a connective tissue disorder which causes widespread dislocation of joints and severe pain and fatigue, Hemiplegic migraines, a rare type of migraine which causes paralysis on one side of the body, and Fibromyalgia, a muscle pain disorder which causes pain and discomfort with every day activities. These medical conditions were permanent and not curable by medication. However, with a variety of medication and proper care, Murray was able to function and succeed academically. She remained at all times a disabled person as these terms are defined under Title III of the American with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

7. These conditions required Murray to undergo extensive and continuous medical treatment, including but not limited to several Cardiology office visits per year, short acting Octreotide injections, monthly Octreotide long acting release injections for her POTS and Vasovagal Syndrome, and other medications including Tramadol, and Codeine Phosphate. In addition, Murray required special accommodations relative to her furniture and housing due to her physical disabilities related to her medical conditions. Prior to her admission to Harvard, Murray was successfully receiving her medical treatments and accommodations in the United Kingdom and from the University of Oxford where she excelled academically and was awarded the Knox Fellowship to study at Harvard. Her disabilities did not prevent her from completing her academic studies provided she received the necessary and reasonable accommodations.

8. Upon her acceptance into the Knox Fellowship program at Harvard, Murray began corresponding with Harvard's Disability Office, the Accessible Education Office (hereinafter "AEO") and numerous other offices at Harvard to inform them of her disabilities and to request reasonable accommodation. Murray's first communication with Harvard's Disability office occurred on or about April 16, 2010. Murray advised Harvard regarding her disabilities, medical conditions and needs and requests for reasonable accommodation. Murray requested reasonable accommodations in order to participate in her fellowship program and because of her disabilities. These included assistance with her medical needs, provision, storing and administration of necessary medications and housing needs particularly without stairs. Her requests were all made in writing. Murray also provided Harvard with all requested medical

2

information to establish her disability pursuant to Harvard's Graduate School of Arts and Sciences policies and procedures contained in Harvard's Student Handbook (hereinafter "Handbook"), AEO guidelines and health service department guidelines.

9. One of Murray's most crucial concerns, which she expressed on numerous occasions to Harvard, was that she be able to receive her monthly intramuscular Octreotide injections while at Harvard. Murray was receiving this monthly injection with extremely positive results in the United Kingdom and it was medically necessary in order for her to be fully functioning.

10. Murray received these injections by a trained medical professional in accordance with proper medical protocol. Murray requested, on numerous occasions, between April-August 2010, that she be administered this injection while at Harvard. Murray was very concerned about self- administering the medication since she had never been required to do it, it had always been administered by a professional and she had been advised by her doctor in the United Kingdom that a professional should do it. In fact, according to the directions provided by the manufacturer of this drug, it was to be administered by a trained medical professional. Murray was also warned by her Cardiologist in the United Kingdom that the injection must be administered by a trained professional, as administration of the injection could be extremely dangerous to the Plaintiff's health if not performed properly. This information was also communicated to Harvard's AEO and Health Services offices.

11. Harvard and Murray entered into a contractual relationship, whereby Harvard agreed to provide her with the teaching and academic resources necessary for her to complete her doctoral education. This included a school and learning environment free from discrimination in accordance with the student "Handbook" provided by Harvard. According to the "Handbook", Harvard had an anti-discrimination policy. The "Handbook" also contained policies and procedures regarding special housing accommodations, accessible education office (AEO), health services, special health care needs, and student health insurance plans. Pursuant to these policies Harvard was required to provide Murray with reasonable accommodations regarding her living arrangements and her medical needs which it failed to do in violation of the law and in breach of contract. Harvard failed to provide Murray with an apartment that did not have stairs, as requested due to her physical disabilities and failed to provide her with her necessary medical services. Murray was wrongfully advised that the health insurance she obtained through Harvard would not provide for her medication nor the administration of the medication by a trained medical professional. She was advised that she could buy separate health insurance if she wanted it and she relied on these misrepresentations to her detriment.

12. Murray arrived at Harvard on or about August 19, 2010. Murray again requested to have her monthly Octreotide injection administered to her. She was informed by Dr. Soheyla Gharib, the Chief of Medicine at Harvard Health Services, that the injection could be administered to her by a medical professional. However, Dr. Gharib retracted this offer shortly after and told Murray that she had been mistaken and could

3

not administer the medication.      This was an intentional and/or negligent misrepresentation since the policy in fact provided otherwise.

13. Harvard informed Murray on numerous occasions that neither the Octreotide injection nor the administrations of the injection were covered by Harvard's health plan. Murray was told that her only option was to self-administer the injection. Murray relied completely on the misrepresentation, to her detriment, provided by Harvard regarding her request for reasonable accommodation and her health coverage issues as a foreign student. She was also told she needed to buy separate health insurance which was not necessary, and based on this misrepresentations Murray was forced to purchase additional medical insurance, at great cost to her.

14. Despite Murray's requests for an apartment without stairs when she arrived at Harvard she discovered that her apartment did have stairs, thereby completely ignoring her requests for a reasonable accommodation.

15. Believing she had no other option and after consultation with her doctor, Murray attempted to self-administer her injection on or about September 2, 2010 with the guidance of her Cardiologist in the United Kingdom via Skype. Harvard and it's doctors were fully aware that Murray was going to self-administer and in fact negligently advised her to do so.

16. Murray had extreme difficulty self-administering the injection as she is left handed and had to administer it to herself in her left buttock. Murray also suffered from hand tremors and as such, could not hold the needle steadily.   This was information provided to Harvard.

17. Within days after her self-administration, on or about September 7, 2010, Murray collapsed at the Harvard Square subway station and was taken by ambulance to the Emergency Room of Mount Auburn Hospital. She was informed by doctors at Mount Auburn Hospital that her collapse was a result of a drastic drop in her blood pressure, caused by failed administration of the Octreotide injection, a known adverse side effect of the failed administration.

18. Murray collapsed again numerous times over the next few days and was taken to Massachusetts General Hospital (MGH) on or about September 9, 2010. She was admitted to the hospital and informed again by her doctors at MGH that her numerous collapses were a result of the failed self-administration of the Octreotide injection. Murray remained hospitalized at MGH for 5 weeks as a result of her failed self-administration.   During this period she was unable to attend to or complete her academic assignments.

19. On or about October 3, 2010, Murray was visited in the hospital by Dr. Gharib who informed Murray that her student health insurance policy had just changed, and the Plaintiff was now eligible to have the cost of her Octreotide injection as well as its administration covered and that a medically trained professional would administer

4

future injections. Dr. Gharib misrepresented to Murray that there had been a change, when in fact there was no change in the actual health insurance policy or Harvard's internal health department policies.   Murray was led to believe that the health insurance company had changed the policy, when in fact the policy that was in effect in August, 2010, specifically provided for administration of the medication by a professional. The policy states:

> "This health plan covers outpatient care to diagnose or treat your medical condition when services or supplies are furnished by a covered provider…This coverage includes: Injections. <u>This includes the administration of injections that you need such as allergy shots or other medically necessary injections.</u>" (Emphasis added.)    Octreotide was a medically necessary injection for Ms. Murray.

20. Murray subsequently requested a copy of her student health insurance policy and discovered that the policy allowing for the administration of her Octreotide injection was effective beginning from at least August 1, 2010.  Upon review of the policy, Murray realized that Dr. Gharib and Harvard had misrepresented the health insurance information and provided her with false and improper advice.  There was never a change in the policy as Harvard and Dr. Gharib represented to Murray but in fact Harvard misrepresented her medical coverage resulting in Murray's self administration of the medication with disastrous results.  This misrepresentation was based upon the intentional conduct and/or the gross negligence of Harvard, its servants, agents and/or employees for whose conduct Harvard was responsible.

21. At all relevant times, Harvard knew or should have known with reasonable care that Murray could have been administered her Octreotide injection by a trained medical professional rather than to advise her to self-administer.  Despite this knowledge, Harvard failed to accurately inform Murray of the medical treatments she was eligible for under her student health plan and Harvard's policies as contained in the Student "Handbook" and allowed her to self administer the injection.  Thereafter, Harvard, its servants, agents and/or employees fraudulently attempted to cover up their negligence and misrepresentations by advising her that the policy had changed.

22. The Plaintiff suffered extreme adverse medical complications as a result of the negligence and misrepresentations she received from Harvard. She remained at MGH until she was transported back to her Bristol, United Kingdom on or about October 13, 2010.  Thereafter she remained hospitalized in the United Kingdom and continues to suffer permanent disabling injuries caused by Harvard.

23. The adverse medical complications that Plaintiff suffered were reasonably foreseeable to the Defendant

24. Murray was discriminated against by Harvard, its servants, agents and/or employees on the basis of her physical disability.  As a place of public accommodation as defined by the Americans with Disabilities Act and Section 504 of the Rehabilitation

Act of 1973, Harvard was prohibited from discriminating against Murray by preventing her from enjoying the full and equal enjoyment of the goods and services Harvard provided to its students. Harvard discriminated against Murray by failing to make reasonable accommodations in her housing arrangements (apartment without stairs and other deficiencies making it less accessible and useful for a handicapped person) and to falsely advise her that her medication and injection could not be provided by Harvard and to allow Murray to self-administer medically necessary injections, after Murray made repeated requests for this accommodation and informed Harvard that her participation in her Fellowship program was dependent on receipt of the injection. An accommodation to allow a trained professional to administer the Octreotide injection to Murray rather than instruct her to risk her health and self administer would have been reasonable on the part of Harvard. The discriminatory conduct and the consequences to Murray were solely by reason of her disability.

25. Murray was an otherwise qualified individual with a disability, who was able to meet all of her Knox Fellowship program requirements in spite of her handicap. Murray was denied the benefits of and participation in this prestigious fellowship program, which accepted her on the basis of her outstanding academic achievements due to Harvard's discrimination against her, in part, based solely on her disability. Due to her medical condition deteriorating as a result of Harvard's conduct, Ms. Murray was forced to leave Harvard and withdraw from the fellowship program. Notice of Murray's complaints about Harvard's misconduct were provided to Harvard, Office for Civil Rights (OCR) and the Massachusetts Commission Against Discrimination (MCAD) and she has complied with all notice requirements applicable to her claim and has received the consent of OCR to prosecute her claims in a court of law.

26. Pursuant to Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act, Title III (ADA 1990), Harvard was prohibited from engaging in discriminatory conduct and from establishing rules and policies that may adversely affect students with disabilities. Harvard misrepresented its policies claiming that Murray's health insurance would not provide for her medication or assistance with its administration, adversely affecting Murray in violation of Section 504 and the ADA.

27. Harvard acted in conjunction with its servants, agents and/or employees in retaliating against Murray when she complained about her living accommodations and lack of medical support. Instead of assisting Murray with her requests for reasonable accommodation, Harvard ignored her requests, transferred her to various persons who provided her with false or misleading information and abandoned its responsibilities required by law and the contract between Murray and Harvard. Had Harvard not discriminated against Murray, provided Murray with the reasonable accommodations she requested and was entitled to, Murray would have been able to complete her academic studies.

## COUNT I – NEGLIGENCE

28. Murray, re-alleges, repeats and incorporates the allegations of paragraphs 1 through 27 as if expressly rewritten and set forth herein.

29. The Defendant, Harvard, acted with carelessness, negligence and recklessness in failing to accurately inform the Plaintiff of the medical resources for which she was eligible under her student health plan, namely that she could receive administration of her monthly Octreotide injection by a trained professional.

30. As a result of the Harvard's negligence through its servants, agents and/or employees for whose conduct it was responsible, Murray, was forced to dangerously self-administer her Octreotide injection, believing she had no other option.

31. As a direct and proximate result of the careless, negligent and reckless conduct of the Defendant, the Plaintiff was caused to sustain severe, disabling and permanent injuries which resulted in hospitalization and medical treatment.

32. As a direct and proximate result of her injuries, the Plaintiff has incurred hospital and medical expenses including, transportation back to the United Kingdom via air ambulance, and continues to incur such expenses. The Plaintiff was also forced to leave her Fellowship program and has been unable to resume her studies or work in the United Kingdom due to her illness, resulting in extreme economic loss.

33. As a direct and proximate result of her injuries, the Plaintiff has been disabled, has been unable to conduct her normal activities of her daily life, has suffered great pain of body and mind and will continue to suffer such pain in the future, and has incurred significant loss and damages.

34. All of such damages are a direct and proximate result of the negligence of the Defendant, Harvard.

WHEREFORE, the Plaintiff, Kylie Murray, asks that judgment be entered in her favor and against the Defendant, Harvard, that she be awarded sufficient sums to compensate her for her injuries, loss, and damages, and that she be awarded her reasonable attorney's fees, interest, costs, and such other and further relief as this Court deems just.

## COUNT II – FRAUD, MISREPRESENTATION AND DECEIT

35. Murray, re-alleges, repeats and incorporates the allegations of paragraphs 1 through 34 as if expressly rewritten and set forth herein.

36. Harvard negligently and/or intentionally misrepresented crucial information to the Plaintiff regarding the availability and administration of her Octreotide injection and

the medical resources available to her, leading her to believe that she could not be provided with and administered the Octreotide injection by a trained professional.

37. At all relevant times, Murray was eligible to have the costs of her Octreotide injections as well as the administration of the injection covered by her student health insurance.

38. Relying upon the fraudulent and/or negligent misrepresentations of Harvard, after Murray self-administered and became gravely ill, Harvard fraudulently misrepresented that the policies had changed and that Murray would be able to receive her medication and have a trained professional administer the medication under Harvard's health program. This representation was intentionally false, since the health insurance policy in affect prior to the self-administration specifically provided that the medication and its administration was a covered item. As a result of Harvard's initial misrepresentation Murray self-administered causing severe injury.

39. At all relevant times, information regarding the availability and administration of Octreotide was readily and easily accessible to the Harvard had Harvard exercised due diligence. The Plaintiff relied on the Defendant's misrepresentations to her detriment.

40. As a direct and proximate result of fraud and intentional and/or negligent misrepresentations of Harvard, Murray was caused to sustain severe, disabling and permanent injuries which resulted in hospitalization and medical treatment.

41. As a direct and proximate result of her injuries, the Plaintiff has been disabled, has been unable to conduct her normal activities of her daily life, has suffered great pain of body and mind and will continue to suffer such pain in the future, and has incurred significant loss and damages.

42. As a direct and proximate result of her injuries, the Plaintiff has incurred hospital and medical expenses including, transportation back to the United Kingdom via air ambulance, and continues to incur such expenses. The Plaintiff was also forced to leave her Fellowship program and has been unable to resume her studies or work in the United Kingdom due to her illness, resulting in extreme economic loss.

43. All of such damages are a direct and proximate result of the fraudulent and/or negligent misrepresentations of the Defendant, Harvard.

WHEREFORE, the Plaintiff, Kylie Murray, asks that judgment be entered in her favor and against the Defendant, Harvard, that she be awarded sufficient sums to compensate her for her injuries, loss, and damages, and that she be awarded her reasonable attorney's fees, interest, costs, and such other and further relief as this Court deems just.

## COUNT III- VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

44. The Plaintiff, Kylie Murray, re-alleges, repeats and incorporates the allegations of paragraphs 1 through 43 as if expressly rewritten and set forth herein.

45. At all relevant times, the Defendant was a public accommodation under the definition of the Americans with Disabilities Act (ADA), prohibiting the Defendant from discriminating against any individual with a disability.

46. At all relevant times, the Plaintiff was disabled within the meaning of the ADA.

47. The Defendant discriminated against Plaintiff, in part, solely on the basis of her disability by failing to provide her with adequate reasonable accommodations to allow her to receive administration of her medically necessary Octreotide injection and proper housing.

48. Since the medication and administration of the Octreotide injection was in actuality covered by the Plaintiff's health insurance plan at the time of her failed self-administration, an accommodation to provide the Plaintiff assistance with her medication would have been reasonable and necessary for the Defendant to make, and Harvard failed to make it.   After Murray became ill from her failed administration of Octreotide, Harvard attempted to deceive Murray and "told her that Harvard's policies had changed providing for the administration of the medication".

49. As a direct and proximate result of her injuries, the Plaintiff has incurred hospital and medical expenses including, transportation back to the United Kingdom via air ambulance, and continues to incur such expenses. The Plaintiff was also forced to leave her Fellowship program and has been unable to resume her studies or work in the United Kingdom due to her illness, resulting in extreme economic loss.

50. As a direct and proximate result of the discrimination against the Plaintiff in violation of Title III of the ADA, by the Defendant, Harvard, the Plaintiff was caused to sustain severe, disabling and permanent injuries which resulted in hospitalization and medical treatment.

51. All of such damages are a direct and proximate result of the discrimination of the Plaintiff by the Defendant, Harvard.

WHEREFORE, the Plaintiff, Kylie Murray, asks that judgment be entered in her favor and against the Defendant, Harvard, that she be awarded sufficient sums to compensate her for her injuries, loss, and damages, and that she be awarded her reasonable attorney's fees, interest, costs, and such other and further relief as this Court deems just including punitive damages if available.

## COUNT IV- VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

52. The Plaintiff, Kylie Murray, re-alleges, repeats and incorporates the allegations of paragraphs 1 through 51 as if expressly rewritten and set forth herein.

53. At all relevant times, Harvard was receiving federal financial assistance as defined in the Rehabilitation Act, prohibiting the Defendant from denying the benefits of or excluding from participation in any of its programs, or discriminating against any otherwise qualified individual with a disability.

54. At all relevant times, the Plaintiff was an otherwise qualified individual with a disability within the meaning of the Rehabilitation Act.

55. The Plaintiff was denied the benefits of and excluded from participating in her Fellowship program as a result of the discrimination she endured by the Defendant due to her disability.

56. As a direct and proximate result of the discrimination against the Plaintiff in violation of the Rehabilitation Act by the Defendant, the Plaintiff was caused to sustain severe, disabling and permanent injuries which resulted in hospitalization and medical treatment and was forced to leave her prestigious graduate program.

57. As a direct and proximate result of her injuries, the Plaintiff has incurred hospital and medical expenses including, transportation back to the United Kingdom via air ambulance, and continues to incur such expenses. The Plaintiff was also forced to leave her Fellowship program and has been unable to resume her studies or work in the United Kingdom due to her illness, resulting in extreme economic loss.

58. All of such damages are a direct and proximate result of the discrimination of the Plaintiff by the Defendant, Harvard.

WHEREFORE, the Plaintiff, Kylie Murray, asks that judgment be entered in her favor and against the Defendant, Harvard, that she be awarded sufficient sums to compensate her for her injuries, loss, and damages, and that she be awarded her reasonable attorney's fees, interest, costs, and such other and further relief as this Court deems just including punitive damages if available.

## COUNT V- BREACH OF CONTRACT

59. Plaintiff hereby incorporates paragraphs 1 through 58 above as though fully set forth herein.

60. At all relevant times, the Plaintiff and the Defendant entered into a legal binding contract whereby Harvard agreed to provide Murray with a learning environment free

from discrimination and suitable for Murray to complete her academic studies and to provide her with all reasonable accommodations necessary to complete her academic studies based upon her disabilities.

61. Pursuant to Harvard's "Handbook" Harvard agreed to provide Murray with an academic environment free from discrimination. Harvard has an anti-discrimination policy which prohibited handicap discrimination consistent with applicable federal and state anti-discrimination laws. Specifically the "Handbook" states:

DISCRIMINATION AND HARASSMENT

It is unlawful, contrary to Harvard's policy, and clearly in violation of the Resolution on Rights and Responsibilities to discriminate on the basis of race, color, sex, sexual orientation, religion, age, national or ethnic origin, political beliefs, veteran status, or disability unrelated to job or course of study requirements. The Faculty Council condemns all forms of discrimination or harassment, whether subtle or overt, and asserts that all members of the University community should join in assuring that all students are accorded the dignity and respect called for in the Resolution. Students who believe they may be victims of any form of discrimination or harassment have recourse to grievance procedures developed by the Faculty of Arts and Sciences. These procedures, which are consonant with public law and the Resolution on Rights and Responsibilities, are summarized on the following pages.

62. Pursuant to the "Handbook", Harvard has a special provision regarding Housing for Students Requiring Accommodations. The contract states as follows:

HOUSING FOR STUDENTS REQUIRING ACCOMMODATIONS

GSAS students who have a disability or health condition that requires a housing accommodation such as accessible housing, proximity to bathrooms, and meals, must notify the Accessible Education Office (AEO) immediately following admission, or as soon as the need is clinically documented, so that proper campus area housing arrangements (if available) can be facilitated. Students bringing medical-related equipment to the graduate residence halls should so declare to AEO to ensure adequate electrical or other considerations. In some circumstances it may be advisable to visit rooms in advance to avoid incompatible arrangements.

An application for disability-related housing is available online and should be submitted as soon as a student knows that he/she will be seeking Harvard housing. Clinical documentation of these issues should be sent separately to Accessible Education Office (AEO) along with the AEO Registration Form which accompanies admission information. Specific guidelines for such documentation may be obtained from the AEO website . The University reserves the right to change a pre-existing housing assignment, even temporarily, if a disability-related life-safety concern exists.

63. Pursuant to the "Handbook", Harvard agreed not to discriminate against students and to provide them with all the necessary and reasonable assistance in order for the student to complete their academic goals. The "Handbook" states:

ACCESSIBLE EDUCATION OFFICE

The University does not discriminate against qualified individuals with disabilities in admission or access to programs and activities. Federal law defines a disability as a physical or mental impairment that substantially limits or restricts the condition, manner, or duration under which a person can perform a major life activity, such as walking, seeing, hearing, speaking, breathing, concentrating, reading, learning, working, or taking care of oneself.

The Accessible Education Office (AEO) serves as the central campus resource for Harvard College, Graduate School of Arts and Sciences (GSAS), and the School of Engineering and Applied Sciences (SEAS) students with documented physical, mental health, and learning conditions. Some students may just want to discuss difficult situations and not request any services at all.

The process of serving students in University-sponsored programs and activities is a collaborative one, with students expected to take the lead in self-disclosing to AEO in a timely manner, providing requested clinical documentation to AEO only, not to academic departments. Students assume responsibility for becoming familiar with AEO and University policies, as well as overseeing the effectiveness and quality of resources and services.

Students are encouraged to make initial contact with AEO upon admission or as soon as health-related concerns arise. Confidential discussions should occur between students and AEO as soon as possible to avoid service delays. Students may want to learn more about accessible transportation, housing, adaptive technology, and other academic adjustments consistent with University policies by reviewing the website and contacting AEO directly.

Documentation for medical leaves of absence should be submitted to the AEO in conjunction with documentation policies.

64. Pursuant to the "Handbook", Harvard agreed to provide all reasonable and necessary health services Murray needed. The "Handbook" provided as follows:

HARVARD UNIVERSITY HEALTH SERVICES

Below is a summary of the services available at Harvard University Health Services (HUHS). We encourage students to visit website for detailed, up-to-date information, including department locations, phone numbers, and hours of operation; how to make appointments; event listings and announcements; and additional health information and resources. Services at Holyoke Center include:

- 24-hour urgent care
- Primary care
- Mental health
- Medical/surgical subspecialties
- Pediatrics

> Primary care and some mental health services are also available at each of the three satellite clinics located on the Law School, Business School, and Longwood Medical School campuses.

### URGENT CARE AND EMERGENCY SERVICES

Any student experiencing symptoms of a medical emergency (e.g., chest pain, severe shortness of breath) should call 9-1-1 immediately. After-hours and weekend care for non-routine, urgent medical concerns or symptoms is available through the After Hours Urgent Care Clinic.

### AFTER HOURS URGENT CARE CLINIC (AHUCC) HUHS

The After Hours Urgent Care Clinic (AHUCC) is open nights, weekends, and holidays. Whenever possible, students are encouraged to call their primary care team or mental health provider for advice during regular office hours.

### PRIMARY CARE SERVICES

HUHS is committed to providing each student with complete, coordinated health care through a working relationship with a primary care team comprised of a primary care physician (PCP), nurse practitioner, registered nurses, and health assistants.

Students are assigned a primary care physician (PCP) and primary care team that will provide care through the year. A complete listing of primary care clinicians is available at the HUHS website. Students may change their PCP at any time for any reason by e-mailing Member Services (mservices@huhs.harvard.edu) with their selection. Students with chronic medical conditions are advised to establish a relationship with the primary care team early in the academic year. It will be helpful to provide copies of medical records of health care received at other facilities.

### PATIENT ADVOCATE

The Patient Advocate is available to assist students with any concerns, questions, or comments. All communications are confidential.

SPECIAL NEEDS

HUHS is prepared to meet the general and special health care needs of students. Early contact with a primary care clinician is advised to establish a base for continuity of care during a student's active stay at Harvard. A variety of access services are available through the Accessible Education Office website, including sign-language and oral interpreters. The Patient Advocate is available to assist individuals with special needs.

65. Pursuant to the "Handbook", Harvard agreed to provide all reasonable and necessary health insurance Murray needed. The "Handbook" provided as follows:

HARVARD UNIVERSITY STUDENT HEALTH PROGRAM (HUSHP)

MASSACHUSETTS INSURANCE REQUIREMENT

Massachusetts law requires that students enrolled in an institution of higher learning in Massachusetts participate in a student health insurance program or in a health benefit plan with comparable coverage. All Harvard students are automatically enrolled in the Harvard University Student Health Program (HUSHP) and the cost of the program is applied to their term bill. (Emphasis added.)

HARVARD UNIVERSITY STUDENT HEALTH Program(HUSHP)

Student Health Fee: Required of all students who are more than half time and studying in Massachusetts. This fee covers most services at Harvard University Health Services, including internal medicine, medical/surgical specialty care, mental health/counseling services, physical therapy, radiology, Stillman Infirmary, and 24/7 urgent care.

Student Health Insurance Plan: Provides hospital/specialty care through Blue Cross Blue Shield of Massachusetts and prescription drug coverage through Medco. Coverage includes emergency room visits, hospitalizations, diagnostic lab/radiology services, ambulatory surgery, specialty care outside HUHS (limited), and prescription drug coverage. Benefit limits and cost-sharing may apply—visit the HUHS website for more details.

VISITING FELLOW STATUS

Visiting fellows are automatically enrolled in the HUSHP. If students have their own health insurance coverage, they may qualify to waive the Student Health Insurance Plan.

66. The Defendant, Harvard, breached its contract with the Plaintiff by failing to provide the services and the reasonable accommodations it had promised the Plaintiff on

numerous occasions as contained in the "Handbook" and the argument between Harvard and Murray.

67. As a direct and proximate result of the Defendant's breach of contract, the Plaintiff was caused to sustain severe, disabling and permanent injuries which resulted in hospitalization and medical expenses.

68. Murray complied with all the conditions required in order to receive the necessary accommodations for her housing and medical needs. Harvard failed to comply with its conditions thereby breaching its contract with Murray.

69. As a direct and proximate result of her injuries, the Plaintiff has incurred hospital and medical expenses including, transportation back to the United Kingdom via air ambulance, and continues to incur such expenses. The Plaintiff was also forced to leave her Fellowship program and has been unable to resume her studies or work in the United Kingdom due to her illness, resulting in extreme economic loss.

70. All of such damages are a direct and proximate result of the breach of contract, by the Defendant, Harvard.

WHEREFORE, the Plaintiff, Kylie Murray, asks that judgment be entered in her favor and against the Defendant, Harvard, that she be awarded sufficient sums to compensate her for her injuries, loss, and damages, and that she be awarded her reasonable attorney's fees, interest, costs, and such other and further relief as this Court deems just.

## COUNT VI– RETALIATION (VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT (ADA) AND SECTION 504 OF THE REHABILITATION ACT OF 1973)

71. Murray, re-alleges, repeats and incorporates the allegations of paragraphs 1 through 70 as if expressly rewritten and set forth herein.

72. Murray communicated with Harvard and its AEO office and provided them with all necessary medical information and documentation regarding her requests for necessary accommodations. Harvard retaliated against Murray as a result of her repeated and detailed requests for reasonable accommodation and housing needs. Harvard ignored her requests, transferred her to different departments and persons having little or no knowledge regarding her needs and created artificial barriers making it extremely difficult and tedious to address her requests. Murray specifically advised Harvard that she could not live in an apartment with steps and asked Harvard to have someone personally visit the apartment to make sure it had no steps, however, Harvard ignored her request, did not visit the property and provided her with an apartment that had steps. When she requested assistance with her medical needs she was falsely advised that they were not available.

73. As a direct and proximate result of her injuries, the Plaintiff has incurred hospital and medical expenses including, transportation back to the United Kingdom via air ambulance, and continues to incur such expenses. The Plaintiff was also forced to leave her Fellowship program and has been unable to resume her studies or work in the United Kingdom due to her illness, resulting in extreme economic loss.

74. All of such damages are a direct and proximate result of the retaliation, by the Defendant, Harvard.

WHEREFORE, the Plaintiff, Kylie Murray, asks that judgment be entered in her favor and against the Defendant, Harvard, that she be awarded sufficient sums to compensate her for her injuries, loss, and damages, and that she be awarded her reasonable attorney's fees, interest, costs, and such other and further relief as this Court deems just.

## COUNT VII– BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

75. Murray, re-alleges, repeats and incorporates the allegations of paragraphs 1 through 74 as if expressly rewritten and set forth herein.

76. All contracts imply good faith and fair dealing between the parties to it.   The covenant of good faith and fair dealing requires that neither party do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.

77. Harvard and Murray entered into a binding contract whereby Harvard promised to provide Murray with a reasonable academic and living environment free from discrimination.  Murray complied with all her obligations pursuant to said contract. Harvard breached its contract by failing to comply with the conditions of the contract regarding specifically by discriminating against her as a disabled person, not providing her with necessary and reasonable medical services and proper housing accommodations which Harvard contracted to do for Ms. Murray. As a result of Harvard's breach of the contract Murray has sustained damages.

78. As a direct and proximate result of her injuries, the Plaintiff has incurred hospital and medical expenses including, transportation back to the United Kingdom via air ambulance, and continues to incur such expenses. The Plaintiff was also forced to leave her Fellowship program and has been unable to resume her studies or work in the United Kingdom due to her illness, resulting in extreme economic loss.

79. All of such damages are a direct and proximate result of the breach of covenant of good faith and fair dealing, by the Defendant, Harvard.

WHEREFORE, Plaintiffs pray that the court grant the following relief against Harvard judgment in favor of the Plaintiff on all counts including attorney fees, costs, interest, all economic loss sustained by the Plaintiff and damages for her personal injuries including pain and suffering and punitive damages.

PLAINTIFF CLAIMS TRIAL BY JURY ON ALL COUNTS.

The Plaintiff,
By Her Attorneys,

David P. Anguera
BBO No. 019610
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
Dated: October 17, 2011                          617-742-1900

17